IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DENNIS A. SIGAFOOS,

        Plaintiff,

v.                                              CIV 01-1455 KBM/LCS – ACE

BOARD OF COUNTY COMMISSIONERS
OF SIERRA COUNTY, et al.,

        Defendants.


## MEMORANDUM OPINION AND ORDER

This matter is before the court on Defendants' Motion For Summary Judgment.  *Doc. 28.* Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties consented to have me serve as the presiding judge and enter final judgment.  Having carefully reviewed the parties submissions and relevant authorities, I find the motion is well taken and will grant it.  Accordingly, the pretrial conference and trial will be vacated.

### I.  Factual Background

Plaintiff Dennis Sigafoos ("Sigafoos") is a former police officer and divorced from his wife, Ms. Nelson.  On Friday afternoon, January 31, 1999, New Mexico State Police officers went to Ms. Nelson's home to investigate a report of a domestic violence incident.  After speaking with Ms. Nelson, they placed Sigafoos under arrest for criminal trespass and assault on a

household member.[1]

The officers then transported him to the police station, which by law they were permitted

to do.  Officers responding to a request for assistance from a person who allegedly has been a

---

[1]  According to the police report Plaintiff attached to his response, he and Ms. Nelson had apparently agreed pursuant to a divorce decree "'to avoid entering each other's property" unless invited.  *Doc. 36,* Exh. 3 at 3 ("Police Report").  On Friday afternoon, December 31, 1999, Ms. Nelson called "911," and New Mexico State Police officers went to her house to investigate a domestic violence incident.  *Id.* at 1.  The dispatcher told the officers that while Ms. Nelson was on the telephone, she could hear a "male subject shouting in the background."  *Id.* at 3.

According to Officer Thomas Harzewski's report, Ms. Nelson told him that she believed Plaintiff may have been the one who was "prowling" around her house earlier.  On the day she called "911," Plaintiff had came over to "talk about why they divorced" and to confront her about "rumors" she allegedly was spreading about [a] prowler incident.  *Id.*  Plaintiff insisted that she talk to him, saying he didn't "know what he might do, he might hurt someone."  *Id.*  He did not heed her request to leave and "put his foot in the doorjamb and then forced his way in" when she tried to shut the door.  *Id.*  Although he had not been physically violent with her in the past, he had been pestering her with telephone calls recently, forcing her to change her number, and he also had bought property across the street from her house with " a full view of her house."  *Id.*  Ms. Nelson noticed that Plaintiff's "temperament has changed and she had seen him with an explosive anger in other situations."  *Id.*

For these reasons she now feared he may become violent with her.  To that point she had not sought a restraining order against him "for fear that he may retaliate" and also because he desired to work in law enforcement again and told her that if "she got a restraining order against him that he would not be able to work."  *Id.*  Ms. Nelson did, however, have a domestic violence packet in her possession, and the officer reviewed the restraining order section "to make sure it was complete."  *Id.*  She advised the officers that she would file a restraining order on the following Monday or as soon as possible.  *Id.*

After his arrest and while in transit to the police station, Plaintiff complained that his ex-wife had battered him in September by slapping him and that the police had not arrested her and also were not properly investigating the prowler incident.  According to Plaintiff, he went to Ms. Nelson's home to ask her for money for their insurance.  He did not deny walking into the house uninvited or refusing to leave saying he wold wait for the police "so that he could get his property."  *Police Report* at 4.  He said yelled at Ms. Nelson about the insurance money and told her to "stop spreading rumors about him being the prowler."  *Id.*  Several times he complained that the male  "is always the one who pays the price in domestic situations, even if it is the female's fault, especially when the female is attractive like his wife."  *Id.*  He also several times "stated further that he would just have to take matters into his own hands if Law Enforcement will not do it properly."  *Id.*

victim of domestic abuse "shall be required to take whatever steps are reasonably necessary to protect the victim from further domestic abuse, including . . . arresting the abusing household member when appropriate." *Id.,* § 40-13-7(B)(5).  Under New Mexico law, "domestic abuse" is defined, among other things, as including severe emotion distress, criminal trespass, telephone harassment, and stalking.  N.M. STAT. ANN. § 401-3-2(C).

After the district attorney cleared which charges should be filed, Officer Harzewski transported Plaintiff to the Sierra County Detention Facility ("SCDF") "where he was incarcerated and advised that due to the domestic violence charges, he had a mandatory four-day cool down period." *Id.*  In his affidavit, Plaintiff asserts that Officer Harzewski told him his bond would be $1,500, *Plf.*'s *Affidavit* at Exh. 2, ¶ 3, but that the booking officer, Officer Bentley told him that he would not be allowed to post bond and would have to be held for the four-day mandatory period. *Id.,* ¶ 5.

Defendants maintain that there is no such policy  mandating that domestic abuse arrestees be detained for a "cooling off" period.  *Doc. 37* at 4 n.3.  Rather, they maintain the Sierra County Magistrate Court Bond Schedule effective January 1, 2000, controlled whether Plaintiff was entitled to post bail upon his arrest.  *See Doc. 29,* Exh. 4.   Sigafoos alleges that no one mentioned a court bond schedule.  *Plf.'s Affidavit* at ¶ 6.

There is no dispute that the applicable state court was closed on the day Plaintiff was arrested, so there is no way he could have been arraigned on Friday December 31, 1999.  *Id.,* Exh. 5.  Likewise, no one disputes that the following Monday, January 3, 2000, was the first time the court was open following the holiday weekend.  Plaintiff was arraigned that day, pleaded not guilty, posted  the $1,500 bond imposed by the court, and released.  *See id.,* Exhs. 6-7.

3

## II.  Procedural Background

Plaintiff filed this action on December 31, 2001.  *Doc. 1.*  He sues the Board of County Commissioners of Sierra County ("Board") as the supervisory power over all county departments within its jurisdiction.  The two such departments that Plaintiff also sues are the Sierra County Detention Center ("SCDC") and Sierra County Sheriff's Department ("Sheriff's Department").  He further sues the "head jail administrator" of SCDC, Russell Peterson, and Sheriff Terry Byers in their official and individual capacities.

Sigafoos does not challenge the basis for his arrest or the delay between his arrest and arraignment.  Rather, his claims are confined to the fact of his detention in jail.  In Counts I and II, Plaintiff alleges that the mandatory cool down period was pretextual, and thus holding him over the weekend was unlawful and violated his right to reasonable bail under the Eighth Amendment, the New Mexico Constitution, and his interest in liberty without due process under the Fourteenth Amendment.  Count IV alleges false imprisonment as a result of these constitutional violations.  Count III is brought pursuant to 42 U.S.C. § 1983, which encompasses the constitutional claims in Counts I and II and further alleges denial of medical care and failure to protect by not placing him in protective custody.  Plaintiff seeks to hold all Defendants liable on all counts.

Defendants argue that they are absolutely and qualifiedly immune and that Plaintiff's causes of action fail to state a claim.

## III.  Summary Judgment Standard

 Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." FED. R. CIV. P. 56(c).  The Court must "view the evidence and draw any inferences in a

light most favorable to the party opposing summary judgment, but that party must identify

sufficient evidence" that would justify sending the case to a jury.  *Williams v. Rice*, 983 F.2d 177,

179 (10th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52 (1986)).

Indeed, summary judgment

> is properly regarded not as a disfavored procedural shortcut, but rather as an
> integral part of the Federal Rules as a whole, which are designed "to secure the
> just, speedy and inexpensive determination of every action.". . .  Rule 56 must be
> construed with due regard not only for the rights of persons asserting claims and
> defenses that are adequately based in fact to have those claims and defenses tried
> to a jury, but also for the rights of persons opposing such claims and defenses to
> demonstrate in the manner provided by the Rule, prior to trial, that the claims and
> defenses have no factual basis.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## IV.  Analysis

### A.  Absolute Immunity

State Rule 6-401 governs bail in New Mexico magistrate court and provides that for any

bailable offense as defined by Article 2 of Section 13 of the New Mexico Constitution, "shall be

ordered released pending trial on his personal recognizance or upon the execution of an unsecured

appearance bond in an amount set by the court."  The New Mexico Constitution provides in

pertinent part:

> All persons shall, before conviction be bailable by sufficient
> sureties, except for capital offenses when the proof is evident or the
> presumption great and in situations in which bail is specifically
> prohibited by this section.  Excessive bail shall not be required, nor
> excessive fines imposed, nor cruel and unusual punishment inflicted.

N.M. Const., Art II, § 13.  The bond schedule for Sierra County Magistrate Court effective

5

January 1, 2000, permits payment of a $500 bond for criminal trespass, but requires "bond to be set by a judge at arraignment/first appearance" for assault against a household member. *Doc. 29, Exh. 4.*

Defendants argue that because the court's bond schedule requires that Plaintiff be detained, they did nothing more than enforce the court directive and, therefore, are entitled to absolute immunity. Plaintiff responds that because the January 1, 2000 bond schedule was not file stamped until January 5, 2000, it is inapplicable to his arrest. Defendants fail to address this argument and further fail to clarify in their reply whether the same procedure was in place by a prior bond schedule. With the facts thus in dispute, the asserted absolute immunity defense cannot be decided on summary judgment.

### B. Qualified Immunity

Defendants also contend, however, that they are entitled to qualified immunity because they "have been unable to find any authority for the Tenth Circuit, the Supreme Court, or a majority of other jurisdictions" that are factually on all fours with the instant case. *Doc. 29* at 7. The Supreme Court recently clarified, however, that "material similarity" on the facts is not the proper inquiry; the test for whether the law is clearly established is "fair notice." *Hope v. Pelzer,* ___ U.S. ___, 122 S. Ct. 2508, 2515-16 (2002). As the Tenth Circuit has observed,

> Defendants are quite correct that there is no case directly on point, either in the Supreme Court or in this circuit. As we noted above, however, this is unnecessary. *Hope v. Pelzer,* ___U.S. ___, ___, 122 S. Ct. 2508, 2516 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. . . . [T]he salient question . . . is whether the state of the law . . . gave [defendants] fair warning that their alleged [actions were] unconstitutional."). A requirement of a case that is directly on point would quickly transform the qualified immunity

6

> standard into an absolute immunity standard in the vast majority of cases. *Yvonne L. v. N.M. Dep't of Human Servs.,* 959 F.2d 883, 892 (10th Cir. 1992). Instead, we recognize that if the authority from other courts is heavily weighted toward plaintiff's interpretation, or if it is clear that doctrine points toward plaintiff's interpretation, we will still hold that the law was clearly established. *Id.*

*Roska v. Peterson,* ___ F.3d ___, 2002 WL 2029303 (10th Cir. 9/5/02).

Yet the qualified immunity inquiry consists of two questions, and the first is not whether the law was clearly established at the time of the incident. Rather, the threshold issue is whether any constitutional violation occurred. *Hope,* 122 S. Ct. at 2513; *Saucier v. Katz,* 533 U.S. 194, 201 (2001); *see also Roska, supra* ("Order is important; we must decide first whether the plaintiff has alleged a constitutional violation, and only then do we proceed to determine whether the law was clearly established."). In the summary judgment context, that means: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier,* 533 U.S. at 201; *see also Agnes Martinez v. New Mexico Dept. of Public Safety,* 2002 WL 1753176 (10th Cir. 7/29/02) (quoting same). If there has been no constitutional violation, the inquiry ends there. Moreover, if individuals have not violated any constitutional right, there can be no basis for municipal liability. *McCook v. Spriner School Dist.,* 44 Fed.Appx. 896, 2002 WL 1788529 (10th Cir. 2002) (case from this district).

Plaintiff's federal claims all hinge on the proposition that he has a federal constitutional right to post bail upon his arrest and prior to any first appearance, thereby securing his immediate release if he so chose. Otherwise, Sigafoos argues, keeping him in jail to force him to ostensibly "cool down" constitutes an unconstitutional punishment.

The Eighth Amendment provides in full, "Excessive bail shall not be required, nor

7

excessive fines imposed, nor cruel and unusual punishments inflicted." For the purposes of this case, the New Mexico Constitution merely adds that the misdemeanors with which Plaintiff was charged are bailable offenses.

No federal court has held that there is a federal constitutional right to bail or instant release. The Supreme Court has not addressed the issue, and all of the other federal authority I have found holds there is no such right and/or the absence of the right entitles defendants to qualified immunity.[2] The decision upon which Plaintiff relies upon is factually inapposite and

---

[2] *See United States v. Salerno,* 481 U.S. 739, 752-53 (1987) ("The [Eighth Amendment], of course, says nothing about whether bail shall be available at all. . . . [W]e reject the proposition that the Eighth Amendment categorically prohibits the government from pursuing other admittedly compelling interest through regulation of pretrial release . . . [noting it previously rejected the proposition that the Eighth Amendment required detained deportees to be] admitted to bail"); *Woods v. City of Michigan City, Indiana,* 940 F.2d 275, (7th Cir. 1991) (assuming that Fourteenth Amendment incorporates the Eighth Amendment bail clause, but holding "[n]othing in the eighth amendment, however, guarantees instant release for misdemeanors or any other offense. Consequently, when Woods was arrested and jailed overnight until his mother arrived to post bail the next morning, he was not denied any substantive rights guaranteed by they federal constitution."); *Doyle v. Elsea,* 658 F.2d 512, 516 & n. 6 (7th Cir. 1981) (noting Third and Eighth Circuit decisions in support of proposition that "it has been held that there is no absolute constitutional right to release on bail"); *Pyka v. Village of Orland Park,* 906 F. Supp. 1196, (N.D. Ill. 1995) ("The defendants are entitled to qualified immunity on this count because the right to make bail, unlike the right to be free from excessive force, is not a constitutional right, and even if it is, it was not clearly established on November 8, 1991."); *Augustus v. Roemer,* 771 F. Supp. 1458, 1462-67 (E.D. La. 1991) (extensive discussion of precedents and other authorities, holding there is not an "implied absolute fundamental right to bail" but that once "eligibility for pretrial release has been determined, the defendant has a substantive due process right to access the bail system").

In a more recent but unpublished decision by the Seventh Circuit, the court made similar observations. I set forth the relevant part of the opinion in full here as opposed to attaching the decision.

> When a warrant issued for Carver's arrest in 1988, bail was set at $3,000.00. Unable to post bail due to indigency, Carver was detained for five days in the Perry County Jail. Upon motion to reduce bail, Carver was released on his own recognizance. . . . We first interpret Carver's claim that he was unjustly detained as alleging a violation of the Excessive Bail Clause. The fact that Carver was ultimately released on a recognizance bond within five days of detention undercuts any potential claim that the bail as set was excessive. Additionally, we note that although there is a constitutional right to be free from excessive bail, there is no absolute right to release on bail. *Stack v. Boyle,* 342 U.S. 1, 4-5

does not support his argument.  *See Gaylor v. Does,* 105 F.3d 572 (10th Cir. 1997).

In *Gaylor*, the plaintiff was arrested on a Friday, his bail was set on Saturday by a magistrate judge and the amount of bail was entered into the jail computer where he was being held.  Prison officials knew bail had been set but told Gaylor that he would have to see a judge to secure a bond determination and be released.  Gaylor's friends repeatedly called the jail asking about bail and were told it had not been set.  *Id.* at 573-74.  The decision holds that Gaylor "obtained a liberty interest in being freed of detention once Magistrate Garcia  set his bond on Saturday morning" and found the jail policy of only informing inmates of their bail status only if they ask unsupported by a legitimate goal.  *Id.* at 577.

Here, in contrast, Sigafoos' bail was not set until he was arraigned on Monday.  He does not argue, nor could he, that the police officer "set" or had the authority to set his bail.  As soon as bond was set, Sigafoos was released.  I therefore find that Defendants are entitled to summary judgment both for failure to state a claim and on qualified immunity.

### C.  Medical Care

Plaintiff alleges that while incarcerated, he was denied his medication for his acid reflux

---

(1951).  Moreover, the Eight Amendment Excessive Bail Clause does not guarantee a right to individualized bail consideration following an arrest.  *Faheeem-El v. Klincar,* 841 F.2d 712, 719 (7th Cir. 1999).  Accordingly, we perceive no constitutional violation in Carver's contention that indigency alone would render any amount of bail "excessive" within the meaning of the Eighth Amendment.  Alternatively, even if we interpret Carver's claim as alleging that his detention in jail for five days deprived him of due process of law, it still fails to state a cognizable section 1983 claim.  *Baker v. McCollan,* 443 U.S. 137, 145-46 (1979) (three-day detention in county jail did not give rise to a deprivation of liberty without due process where arrest was pursuant to a valid warrant; *see Juriss,* 957 F.2d at 350.

*Carver v. Heisner,* 986 F.2d 1424, 1993 WL 47209 (7th Cir. 1993) (unpublished).

9

condition, denied medical assistance for chest pain, and denied aspirin.  *See Doc. 36* at 16; *Plf.'s Affidavit* at ¶ 7.  The arrest/booking report indicates that Plaintiff had no medical or mental problems and was not taking any medicine.  *Doc. 29,* Exh. 1.  His medical intake form shows no medical problems save for treatment for depression.  *Id.,* Exh. 3.  Plaintiff's answers to interrogatories, however, state:

> While I was confined, I was denied medical attention for my acid reflux and also denied medication for my acid reflux.  When I requested to see a doctor for chest pains I was experiencing, my request was denied.  I was also denied aspirin from detention center personnel, when I requested it.

*Doc. 36,* Exh. 4 (Answer to Interrogatory No. 7).

> At the initial medical screening, Deputy Bentley asked me about any heart condition that I had.  I told him that I had spent three days in a cardio unit for a suspected heart condition, but it turned out to be acid reflux.  I also informed him that I was taking medication for that condition and that the medication was at my apartment in Las Cruces, New Mexico.  Deputy Bentley asked me if anyone could bring it to me.  I told him that I did not know of anyone that could do so.  Deputy Bentley then became agitated with me and I was not asked about any other medical conditions.

*Id.* (Answer to Interrogatory 19).

> On January 1, 2000, at approximately 6:00 a.m., a deputy walked by my cell and I told him that I was having chest pains since about 11:00 p.m.  I do not know the deputy's name, but it was not Valerie Clark or the deputy I knew as Greg.  He told me to wait until 8:00 a.m., when the medical deputy would come on duty.
>
> Nobody came to check on me at 8:00 a.m.  At lunchtime, the inmate who I have identified at "Jay," finally told an individual who he identified as "Steve," the medical deputy, that I had been waiting to see him.  Steve told me that he thought I was okay and he was not going to check on me.  I told him that I was not okay and needed to see a doctor.  He refused my request, stating that it was not going to happen.  He never performed any checkup on me.

*Id.* (Answer to Interrogatory 20).

I will assume for the purposes of argument that Plaintiff's acid reflux and resulting chest pain are serious medical conditions for which he did not receive prescribed medication or treatment and, therefore, that he states an Eighth Amendment claim. Yet, Plaintiff makes no allegation that any of the individual defendants were personally involved in the alleged denial of care. Liability under § 1983 cannot be based on *respondeat superior. E.g., Mitchell v. Maynard,* 80 F.3d 1433, 1441 (10th Cir. 1996). The defendants named in this suit, therefore are entitled to summary judgment. Since the individuals cannot be held liable, there is no basis upon which to find the municipal entities liable. *E.g., Trigalet v. City of Tulsa, Oklahoma,* 239 F.3d 1150, 1154 (10th Cir.), *cert. denied,* 122 S. Ct. 40 (2001).

Although the above analysis is dispositive of the claim, I also note that Plaintiff offers no evidence to contradict the affidavit establishing that the Sheriff's Department has no control over SCDF. *See Doc.* 29, Exh. B at ¶ 3. Sigafoos further fails to identify any SCDF or county policy or custom upon which to find a basis municipal liability. *E.g., Camfield v. City of Oklahoma City,* 248 F.2d 1214, 1229 (10th Cir. 2001).

On a motion for summary judgment, once Defendants show an absence of issues of fact, Plaintiff "cannot rest upon his . . . pleadings, but 'must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which [he or she] carries the burden of proof.'" *Craig v. Eberly,* 164 F.3d 490, 493 (10th Cir. 1998) (citation omitted). To successfully oppose summary judgment, the nonmoving party must show that there is a "genuine" issue of fact, which requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

I recognize that discovery was stayed pending resolution of this motion. However, before that order entered, in addition to the initial disclosures, the parties had four months within which

11

to conduct discovery.  Moreover, Plaintiff made no request that limited discovery was necessary to respond to the motion.  *See* FED. R. CIV. P. 56(f).  For the reasons stated, Plaintiff fails to meet his burden here and consequently Defendants are entitled to summary judgment on this claim as well.

### D.  Conditions of Confinement

Plaintiff alleges that he has developed respiratory problems due to exposure of smoke in the cells from cigarettes, burning paper and plastic,.  *Doc. 36,* at 17; *Plf.'s Affidavit* at ¶ 7.  In his affidavit and Complaint, Sigafoos also alleges a failure to protect by not moving him to protective custody upon his request:

> As a retired police officer I asked to be placed alone for my protection and my request was denied as I was placed in the general population.  While I was unlawfully confined, the detention center was overcrowded.  I was subjected to a smoke filled cell from inmates burning cigarettes, paper, and plastic.  I suffered respiratory problems as a result of this.

*Doc. 36,* Exh. 4 (Answer to Interrogatory No. 7); *see also Complaint,* ¶ 25.

Although it does not appear that the Tenth Circuit has entertained a prison "secondhand" smoke case, the Supreme Court and other circuits have:

> The Supreme Court has applied a two-prong test to determine whether exposure to second-hand smoke violates a prisoner's Eighth Amendment right.  First, a prisoner must prove objectively that he is "being exposed to ***unreasonably high levels*** of ETS [Environmental Tobacco Smoke]."  *Helling v. McKinney,* 509 U.S. 25, 35 (1993) (emphasis added).  In assessing this first factor, the court must conduct an inquiry into the seriousness of the potential harm and into the likelihood that second-hand smoke will actually cause such harm.  *See id.* 509 U.S. at 37.  The court also has to determine "whether society considers the risk . . . to be so grave that it violates contemporary standards of decency to expose ***anyone*** unwillingly to such a risk."  *Id.* (emphasis in original). Second, the prisoner must show that prison authorities demonstrated a "deliberate indifference: to his plight.  *See id.*

12

*Richardson v. Spurlock,* 260 F.3d 495, 498 (5th Cir. 2001); *see also Scott v. District of Columbia,* 139 F.3d 940 (D.C. Cir.) ("*Helling* did not read the Eighth Amendment as mandating smoke-free prisons."), *cert. denied,* 525 U.S. 851 (1998).

   *Richardson* held that a prisoner who was exposed to smoke during bus rides fails the first prong and cites other decisions where exposure for even longer periods likewise fails.

> For example, the Seventh Circuit has held that an inmate who shared a cell with a smoker for 133 days failed to show that he had a serious medical need or that he had been denied "the minimal civilized measure of life's necessities."  [*Oliver v. Deen,* 77 F.3d 156, 159 (7th Cir. 1996)] (internal citations omitted).  *See also Guilmet v. Knight,* 792 F. Supp. 93 (E.D. Wash.1992) (holding that being housed with a smoker for 15 days did not "pose[ ] an unreasonable risk to his health, much less that he was denied 'the minimal civilized measure of life's necessities'").

*Richardson,* 260 F.3d at 499.  I find these decisions persuasive and dispositive of Plaintiff's brief stay in prison as well.

   As for his failure to protect claim, again liability cannot be based on *respondeat superior,* and Plaintiff fails to produce any evidence that the named defendants knew of his placement request and failed to protect him.  In the context of a former prosecutor who alleged he should have been placed in protective custody upon his request, the Tenth Circuit held that

> [i]n order to state a claim under § 1983 against Mr. Neet and Mr. Zavaras, Mr. Schwartz needed to show that they failed to act to protect him despite their knowledge of a substantial risk of serious harm. . . .  Supervisor status by itself is insufficient to support a claim under § 1983. . . .  There must be a showing of personal involvement or knowledge. . . .  Mr. Schwartz fails to provide any allegations in his appellate brief addressing any personal knowledge or involvement on the part of Mr. Zavaras regarding his requests for protective custody.  Nor were we able to find any such evidence in the record.  The only indication is a statement in Mr. Schwartz's response to the defendants' Motion for Summary Judgement where he alleges that he wrote Mr. Zavaras a letter.  He does not indicate when he wrote this letter or what he said in this letter.  This simple,

> unsupported and conclusory allegation is not enough to create liability for § 1983 purposes or to withstand a motion for summary judgment.
>
>   Mr. Schwartz does make factual allegations that he personally discussed his need for protective status with Mr. Neet and that Mr. Neet was the one who addressed his grievances.  Mr. Schwartz, however, fails to provide any evidence to show that Mr. Neet was responsible for placing him in the general population. Instead, the record does show that after Mr. Schwartz protested his placement in the general population, Mr. Neet was responsible for having him taken out of the general population and placed in administrative segregation. . . .  Even assuming Mr. Schwartz faced a risk of serious harm from being placed in the general population, the record fails to provide any facts to establish that either Mr. Neet or Mr. Zavaras had the requisite knowledge and failed to protect him.

*Schwartz v. Zavaras,* 96 F.3d 1453 (10th Cir. 1996) (not attached since relevant portion reproduced in full).  As with the medical claim, Plaintiff comes forth with no evidence showing that the individual defendants were aware of any alleged request for protective custody.

   Wherefore,

   **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment *(Doc. 28)* is GRANTED and that this action be dismissed with prejudice pursuant to the final order entered concurrently herewith.

   **IT IS FURTHER ORDERED** that the pretrial conference and jury trial set for November 1, 2002 and December 2, 2002 respectively, are VACATED, and that the Joint Motion to Vacate Trial Setting *(Doc. 39)* is DENIED AS MOOT.


_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.

14